[657 NYS2d 164]

In the Matter of Jessica R. and Others, Children Alleged to be Neglected. Shelda G., Respondent; Commissioner of Social Services of the City of New York, Appellant.

First Department, May 6, 1997

---

## APPEARANCES OF COUNSEL

*Barbara H. Dildine* of counsel *(Jane M. Spinak, Law Guardian),* for infants.

*Lawrence A. Salvato* for respondent.

*Kathleen Alberton* of counsel *(Larry A. Sonnenshein* on the brief; *Paul A. Crotty, Corporation Counsel* of New York City, attorney), for appellant.

## OPINION OF THE COURT

MILONAS, J. P.

On March 12, 1996, respondent brought her two-year-old daughter Megan to North Central Bronx Hospital for a neurological examination and psychiatric evaluation on the recommendation of her pediatrician. Megan suffered from febrile seizures, frequent ear infections and pica, an eating disorder involving ingestion of nonfood such as paint chips. Dr. John Connors, director of the hospital's Child and Adolescent Crisis Intervention Program, which operates out of the emergency room, examined Megan and observed respondent's behavior while she was in the emergency room with her daughter. He testified at the Family Court fact-finding hearing that respondent was extremely irritable and hostile toward Megan. Specifically, she called Megan a "bitch;" repeatedly referred to Megan as a "bad child;" said Megan "had the devil in her" like her father; and expressed her belief that Megan deliberately engaged in disruptive behavior to irritate respondent, such as climbing on the stove, turning on the burners, and setting papers on fire. Respondent said that Megan barely slept at night, and that she in turn prevented Megan from napping during the day to show her what it felt like to stay awake. While at the hospital, when Megan indicated she had to go to the bathroom, respondent told her to go ahead and wet herself (respondent testified at the hearing that Megan was wearing a diaper at the time). Respondent also said it was "a miracle" she had not killed the child; that she had thoughts of killing herself; and that she had an insurance policy that would take

care of her children (at the time, her older daughter was 13 and her son 11).

Dr. Connors observed that, while in the emergency room, Megan stayed away from respondent, running and climbing everywhere; respondent made no effort to supervise or restrain her. Based on his observations and examination of Megan, Dr. Connors believed that Megan was suffering from various language disorders and hearing impairment, as well as severe hyperactivity. Based on respondent's statement that Megan ate lipstick, nail polish and powder, he suspected that she might also have lead poisoning. He informed respondent that Megan needed certain assessments or tests, and explained that some of her disruptive behavior might be due to her physical ailments. Respondent denied that Megan suffered from any of the physical ailments Dr. Connors enumerated and initially refused to consent to any of the tests, insisting that Megan did not need them.

Dr. Connors further testified that respondent said three times that she had a weapon on her and made "specific threats" toward him and other hospital staff. He and the staff became so concerned by her behavior and threats that they were moved to contact the adult psychiatric emergency room to have respondent examined. Hospital police were summoned to escort her to the adult emergency room, and they found a box cutter in her jacket (she was not wearing it at the time). The psychiatrist who examined respondent found her behavior consistent with a diagnosis of borderline personality disorder, indicating the need for outpatient treatment, and, if the behavior escalated, hospitalization.

Respondent testified at the hearing and denied making any of the remarks attributed to her by Dr. Connors. As to the box cutter, she explained that she always carried it because Megan's father, who lived in the same building as respondent's mother, threatened to kill her when she came into the building, which was down the block from where she lived with her children. Indeed, although she denied speaking of Megan's father at the hospital, according to Dr. Connors, she told hospital staff that Megan's father was stalking her.

Inexplicably, Family Court rejected Dr. Connors' testimony and dismissed the petitions. According to Family Court, what Dr. Connors found troubling was nothing more than respondent's expression of justified frustration in the face of Megan's disruptive behavior, failure to become toilet-trained and sleeplessness. In addition to rejecting Dr. Connors' conclusions,

Family Court also disregarded his factual account of what transpired at the hospital, finding instead that respondent became hostile only when she learned that Administration for Children's Services had been called and her children might be taken away from her. With respect to the box cutter—and respondent's explanation for it—Family Court observed that respondent had not actually taken it out "to threaten anybody."

In its decision, issued on the record immediately following the hearing, the court not only speculated as to Dr. Connors' personal status ("he probably has not been a parent"), but also injected its own personal experience, or lack thereof, to conclude that respondent was no more than an exhausted mother of an uncontrollable child. Finding further fault with Dr. Connors' assessment of respondent's behavior, Family Court commented that he should be working in "a very happy, orderly environment, not in the Bronx, because he certainly lacks any knowledge of the culture and the traditions." There is no basis whatsoever in the record for this observation, and we note the doctor's testimony that, having examined approximately 100 children during his tenure at the hospital, he was prompted to call Administration for Children's Services on only three occasions. We further reject, and are at a loss to explain, Family Court's offensive and demeaning intimation that respondent's behavior reflects Bronx "culture and * * * traditions."

To the contrary, we find that Dr. Connors' credible testimony established by the preponderance of the evidence that Megan was a "neglected child" within the meaning of Family Court Act § 1012 (f), "whose physical, mental or emotional condition has been impaired or is in imminent danger of becoming impaired" as a result of the parent's failure to "exercise a minimum degree of care" in providing her with "proper supervision or guardianship * * * or by any other acts of a similarly serious nature requiring the aid of the court" (Family Ct Act § 1012 [f] [i] [B]).

A finding of neglect needs "[n]o showing of past or present harm" to the child (*Matter of Madeline R.*, 214 AD2d 445, 446). Rather, a preponderance of the evidence must show parental failure to exercise a minimum degree of care, impairment or imminent danger of impairment to the child, and a causal connection between the two (*see, Matter of T. Children*, 210 AD2d 187). This standard was met here by evidence of Megan's medical and behavioral history, Dr. Connors' own observation and

examination of Megan, and the conduct and remarks of respondent as witnessed by the hospital staff. Danger of impairment was further heightened by respondent's psychological state, notwithstanding the fact that she did not require immediate hospitalization and was not conclusively diagnosed (*see, Matter of Zariyasta S.*, 158 AD2d 45; *see also, Matter of Christina LL.*, 233 AD2d 705, 708-709). We note that, while respondent cites her diligence in bringing Megan to the hospital in the first instance, she resisted Dr. Connors' attempts to schedule the necessary workups, denying the possible physical causes of Megan's behavior.

Finally, a finding of derivative neglect as to the two older children should have been made based on the same evidence (Family Ct Act § 1046 [a] [i]). Family Court also had before it the psychological evaluations of all three children, which indicated that respondent had infected the older siblings with the notion that Megan is a bad child possessed of "evil spirits," causing them to treat her accordingly (*see, Matter of Jennifer F.*, 235 AD2d 855, 856-857).

Accordingly, the order of the Family Court, Bronx County (Cira Martinez, J.), entered October 21, 1996, which, after a fact-finding hearing, dismissed three petitions brought pursuant to Family Court Act article 10 alleging neglect on the part of respondent, Shelda G., should be reversed, on the law and the facts, without costs, the petitions reinstated, findings of neglect entered, and the matter remanded for a dispositional hearing before another Judge of the Family Court, pending which the remand status of the children is continued.

ELLERIN, NARDELLI and TOM, JJ., concur.

Order, Family Court, Bronx County, entered on or about October 21, 1996, reversed, on the law and the facts, without costs, the petitions reinstated, findings of neglect entered, and the matter remanded to the Family Court for a dispositional hearing before another Judge, pending which the remand status of the children is continued.